# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-00179-GPG-MDB

PHILIP G. PETERSON, in his capacity as Successor Advisor to the Peterson Family Stewardship Fund,

    *Plaintiff*,

v.

CHRISTIAN COMMUNITY FOUNDATION, INC. d/b/a WaterStone, a Colorado nonprofit corporation,

    *Defendant*.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Philip G. Peterson ("Plaintiff"), in his capacity as Successor Advisor to the Peterson Family Stewardship Fund (the "Fund"), for his Complaint against Defendant Christian Community Foundation, Inc. d/b/a WaterStone ("WaterStone" or "Defendant"), alleges as follows:

### INTRODUCTION

1. This action concerns WaterStone's administration of the Peterson Family Stewardship Fund, a donor-advised fund holding more than $21 million in charitable assets. WaterStone is a Colorado-based Christian nonprofit that provides charitable giving services by, among other things, sponsoring donor-advised funds. Donor-advised funds are vehicles through which donors contribute assets, receive immediate tax deductions, and subsequently recommend grants to qualified

charities of their choice. WaterStone markets itself to Christian donors as a faith-based alternative to secular fund sponsors, stating its mission as "honor[ing] God through the transformational power of giving." In exchange for holding and investing charitable assets in donor-advised funds, WaterStone commits to honor the grant recommendations of fund advisors; it holds itself out to the public as a donor's "charitable bank account."

2.      Plaintiff Philip Peterson is the designated successor advisor to the Fund, which his father established with WaterStone in 2005 to support Christian ministries. Since 2024, WaterStone has refused to communicate with Mr. Peterson, denied his access to the Fund's account information, declined to process his grant recommendations, and has failed to make charitable distributions from the Fund. The year 2024 was the first time in the Fund's nineteen-year history that no grants were made to any charity.

3.      WaterStone's CEO told Mr. Peterson never to contact WaterStone again. WaterStone has refused to provide Mr. Peterson with the governing documents or any accounting of the Fund's assets. WaterStone's stated position is that it owes *no* duties to its fund advisors and may disregard them entirely. If correct, WaterStone may indefinitely retain millions in tax-advantaged charitable assets for its own purposes while ignoring the donor's designated advisor and making no distributions to charity. Mr. Peterson seeks damages as well as declaratory and injunctive relief establishing his rights as advisor and, ultimately,

compelling WaterStone to transfer the Fund in kind to a sponsor that will honor the Fund's charitable purposes.

## PARTIES

4. Plaintiff Philip Peterson is an individual resident and citizen of Mission Hills, Kansas. He brings this action in his capacity as the contractual advisor to the Peterson Family Stewardship Fund, a donor-advised fund maintained by WaterStone. Plaintiff has authority to assert the claims made herein on behalf of the Fund and in furtherance of the donor's intent and advisory rights.

5. Defendant Christian Community Foundation, Inc. d/b/a WaterStone ("WaterStone") is a Colorado nonprofit corporation with its principal office at 10807 New Allegiance Drive, Colorado Springs, Colorado 80921.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff, a citizen of the State of Kansas, and Defendant, a citizen of the State of Colorado, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

8. WaterStone is a national sponsoring organization of donor-advised funds and related charitable giving services. Its 2023 Form 990 states that WaterStone's mission is to "provide *excellence in personalized charitable giving services* and education resources" (emphasis added).

9. As a sponsor of donor-advised funds, WaterStone solicits and receives charitable contributions from donors, holds the contributed assets, and promises to administer those assets consistent with the donor's charitable purpose after giving good-faith consideration to the recommendations of the Fund's advisor.

10. WaterStone's website explains that a WaterStone donor-advised fund "operates like a charitable bank account. You can make a contribution of cash, appreciated assets, or other non-traditional gifts into your Giving Fund and receive an immediate charitable deduction. Once the fund is established, you can recommend grants to the charities of your choice on your timeline":

## How it Works

A Giving Fund operates like a charitable bank account. You can make a contribution of cash, appreciated assets, or other non-traditional gifts into your Giving Fund and receive an immediate charitable deduction. Once the fund is established, you can recommend grants to the charities of your choice on your timeline.

*See* WaterStone: Giving Fund, *available at* https://perma.cc/DA42-GJYY.

11. WaterStone's website asserts that it exists to "[h]onor[] God through the transformational power of giving." It also claims to "[s]erv[e] Givers at the intersection of faith and finance." WaterStone states it "[b]uild[s] the Kingdom by

4

transforming assets into living water." And it claims its "[v]alues" are "Christ-centered: Love, Integrity, Service." *See* WaterStone: About, *available at* https://perma.cc/GTQ3-BCMS.

12.     WaterStone has made these and similar representations to its charitable services customers for several decades, including to Plaintiff.

13.     Plaintiff justifiably relied on these representations in becoming the advisor to the Fund and in administering the Fund. Plaintiff believed that Waterstone would provide excellence in personalized charitable giving services and education resources; that the Fund would operate as a charitable bank account; that Plaintiff would be allowed to recommend grants to charities of his choice on his timeline; and that Waterstone would act in good faith.

14.     These representations were false. After recognizing Plaintiff's rights as advisor to the Fund for several years, Waterstone abruptly revoked Plaintiff's access to the Fund, has refused to provide charitable giving services to Plaintiff, Plaintiff has not been able to make recommendations, and Waterstone has acted in bad faith.

15.     The Peterson Family Stewardship Fund is a donor-advised fund sponsored and administered by WaterStone.

16.     The term "donor-advised fund" is defined by statute as "a fund or account --

5

(i)     which is separately identified by reference to contributions of a donor or donors,

(ii)    which is owned and controlled by a sponsoring organization, and

(iii)   with respect to which a donor (or any person appointed or designated by such donor) has, or reasonably expects to have, advisory privileges with respect to the distribution or investment of amounts held in such fund or account by reason of the donor's status as a donor."

26 U.S.C. § 4966(d)(2)(A).

17.     As of December 31, 2023, the Fund's balance was $21,071,102.

18.     The Fund was created in 2005 by Plaintiff's father, Gordon J. Peterson.

19.     On December 1, 2005, Gordon Peterson submitted an Application and Purpose Statement attached hereto as **Exhibit 1**, reflecting his evangelical mission and charitable objectives in establishing the Fund.

20.     On information and belief, following his application, Gordon Peterson entered into an agreement or agreements with WaterStone that identified the parties' respective rights and incorporated WaterStone's policies and procedures by reference.

21.     Plaintiff has repeatedly requested a copy of the Fund agreement or agreements, but Waterstone has refused to provide a copy of them.

6

22.     In Plaintiff's conversations with Waterstone about the Application and the Fund agreement or agreements, Waterstone has never indicated that the Application is also the Fund agreement or agreements.

23.     Further, Waterstone has refused to provide a copy of its policies and procedures to Plaintiff.

24.     As necessary, the parties have agreed to amend the Fund agreement or agreements.

25.     In November 2017, for example, Gordon Peterson and Plaintiff contacted John Mulder at Waterstone to request an amendment to the Fund agreement to name Plaintiff as a co-equal donor advisor.

26.     Mr. Mulder, on behalf of Waterstone, agreed to the amendment.

27.     As part of that amendment, on November 1, 2017, Gordon Peterson duly designated his wife, Ruth Peterson, and Plaintiff Philip Peterson as "co-equal advisors" of the Fund, as shown in **Exhibit 2** hereto.

28.     At that time, Mr. Mulder represented that Plaintiff would be an advisor to the Fund, would be granted online access to the Fund account information, that he would have full authority to make grant recommendations, that those recommendations would be considered in good faith by Waterstone, and that Waterstone would include Plaintiff in discussions regarding the Fund, its administration, grant-making, and investment strategy.

7

29.     Waterstone also represented at the time that it would operate the Fund in accordance with its policies and procedures.

30.     Plaintiff justifiably relied on these representations in becoming an advisor to the Fund and to maintain the Fund at Waterstone. Had Plaintiff known that Waterstone's representations were false, he would have transferred the Fund immediately to a different sponsoring organization.

31.     Contrary to its representations, Waterstone has refused to recognize Plaintiff as the Fund's advisor; refused to communicate with Plaintiff; refused to consider his grant recommendations in good faith; refused to communicate with him regarding the Fund, its administration, grant-making, and investment strategy; and refused to provide Plaintiff with Waterstone's policies and procedures.

32.     Indeed, CEO Ken Harrison, on behalf of Waterstone, later admitted that these representations were false. He told Plaintiff, among other things, that Waterstone owed no duties to Plaintiff; that Waterstone had no obligation to include Plaintiff in the process of grant-making or fund administration; that Waterstone could shut off Plaintiff's access to Fund information at any time for any reason without cause or explanation; and that Waterstone had no obligation to communicate with Plaintiff or consider his grant recommendations in good faith. Mr. Harrison indicated that any rights that an advisor or donor to a Waterstone donor-advised fund had were exercised solely at Mr. Harrison's discretion.

8

33.    On Ruth Peterson's death in 2021, Plaintiff Philip Peterson became the sole advisor of the Fund pursuant to the DAF agreement. Plaintiff remains the only individual entitled to exercise all rights associated with the Fund.

34.    From 2017 to 2023, WaterStone worked with Plaintiff as the advisor to the Fund and uniformly approved and administered his grant recommendations.

35.    Despite this, in March 2024, WaterStone abruptly removed Plaintiff's access to the Fund's account information and online portal in an effort to deny Plaintiff his advisory role.

36.    Around that same time in 2024, Plaintiff had pending with WaterStone a grant request of approximately $1 million for Operation Mobilization, a Christian missionary organization that focuses on humanitarian efforts, evangelism, and discipleship worldwide. WaterStone ignored the grant request and has never made the requested donation, despite having approved prior grants from the Fund to Operation Mobilization.

37.    Never before had a request to WaterStone to make a grant from the Fund ever been refused or left pending indefinitely.

38.    WaterStone made no charitable donations at all from the Fund in 2024, for the first time since the Fund was established in 2005. While WaterStone distributed no money in furtherance of the Fund's evangelical mission in 2024, in 2024 WaterStone officers received pay increases and bonuses.

9

39.    In 2025, WaterStone officials stated that, because of their unfounded negative feelings toward Plaintiff, WaterStone would not accept Plaintiff's recommendations for grants, and refused to have any further communication with him.

40.    WaterStone has otherwise failed and refused to fulfill its duties to Plaintiff and the Fund, including but not limited to, by the following acts and omissions:

a.    Failing to timely consider, process, and honor grant recommendations submitted by Plaintiff as the Fund's advisor.

b.    Imposing undisclosed and unauthorized restrictions and conditions on grant recommendations, including delaying or denying recommendations that met the Fund's agreed-upon Purpose Statement, such as the Operation Mobilization grant recommendation that fell squarely within the Fund's express purpose and established giving history.

c.    Failing to provide timely, accurate statements and accountings of the Fund's assets, transactions, fees, and performance.

d.    Failing to respond to reasonable requests of Plaintiff for information and documents (including the Fund's contract and related documents) regarding the Fund and the uses of the Fund.

e.     Retaliating against and disregarding Plaintiff's inquiries and requests for information regarding the Fund and its administration out of personal animosity of WaterStone officials toward Plaintiff.

f.     Refusing even to communicate with Plaintiff, much less consider his recommendations for donations from the Fund, and directing Plaintiff to refrain from further attempts to communicate with WaterStone.

41.     WaterStone's bad faith conduct has interfered with the charitable purposes of the Fund and its advisor's right to have his recommendations accepted and considered in good faith in furtherance of the philanthropic purposes and objectives of the Fund.

42.     Among other things, with no distributions being made from the Fund, the Fund's purpose of supporting charitable endeavors has been defeated.

43.     Plaintiff has repeatedly demanded in writing and orally that WaterStone cure its breaches and fulfill its duties.

44.     On or about March 5, 2024, Ken Harrison, WaterStone's CEO, conducted a Zoom call with Plaintiff during which Mr. Harrison informed Plaintiff that WaterStone was terminating further communication with Plaintiff about the Fund.

45.     At the conclusion of the March 5, 2024 call, Mr. Harrison directed Plaintiff to never contact WaterStone again and abruptly ended the Zoom call.

11

46.     During the March 5 Zoom call, Mr. Harrison swore at Plaintiff and used abusive language toward him.

47.     After the Zoom call, Plaintiff discovered that his online access to Fund information was terminated.

48.     On or about March 11, 2024, in an attempt to restore his relationship with WaterStone and regain access to information about the Fund, Plaintiff sent an email to WaterStone, expressing a desire to restart Plaintiff's relationship with WaterStone.

49.     Mr. Harrison responded to Plaintiff with an email that was accusatory and unprofessional. John Mulder, WaterStone's past president and current "chief generosity advisor," responded that there might be a way for Plaintiff to be restored to the account, but Plaintiff never heard back from WaterStone regarding this possibility.

50.     During August 2-6, 2024, Plaintiff sent a letter to each member of WaterStone's Board of Directors explaining the situation and seeking their assistance in resolving it. WaterStone and its board members provided no reply or acknowledgment of these letters.

51.     Later, Plaintiff again emailed several members of WaterStone's Board of Directors seeking resolution. Again, WaterStone and its Board members provided no response.

52.     On or about February 5, 2025, after a year of making no distributions from the Fund, Mr. Mulder finally contacted Plaintiff to inform him that WaterStone would permit a distribution of $400,000 from the Fund. Upon information and belief, this $400,000 was the only amount of the Fund that was not invested by WaterStone.

53.     Plaintiff directed this distribution to organizations that the Fund had historically supported and reminded WaterStone that the Fund was approximately $4.5 million behind in distributions over the prior two years.

54.     WaterStone sent the grant checks as directed but did not respond to Plaintiff's concerns about the distribution shortfall.

55.     Notably, in a conversation that occurred after the death of Plaintiff's father, Gordon Peterson, in 2019 but before Ruth Peterson's death in 2021, Mr. Mulder told Plaintiff about another donor-advised fund situation in which the donor had died and the children who were the fund's advisors wanted to make grants to organizations that WaterStone would not approve.

56.     Mr. Mulder told Plaintiff that WaterStone informed those advisors that WaterStone would not approve the grants because they were outside WaterStone's stated giving principles but that the advisors could transfer the account to another organization who would, and WaterStone would facilitate moving the account.

57.     He then added, referring to the Peterson Family Stewardship Fund, "but the account isn't as large as your father's."

58.     Plaintiff justifiably relied on Mr. Mulder's representation that a fund advisor could transfer their fund to a different sponsoring organization at any time.

59.     Waterstone's statement was false. When Plaintiff requested, pursuant to Waterstone's representation, that it transfer the Fund, Waterstone refused.

60.     As a direct and proximate cause of WaterStone's acts and omissions, the Fund and Plaintiff have suffered and continue to suffer damages, including but not limited to, lost charitable opportunities, diminution or impaired use of Fund assets, administrative delays causing adverse grant timing, and costs incurred to investigate and address WaterStone's noncompliance with its obligations, including attorneys' fees.

61.     All conditions precedent to the bringing of this action have occurred or been performed.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

62.     Plaintiff incorporates herein the allegations set forth above.

63.     There exists a valid, enforceable contract governing the administration, investment, and grant-making processes of the Fund, as well as related disclosures, communications, and fees.

64.     In late 2005, Gordon Peterson opened a donor-advised fund at WaterStone and served as the advisor to the Fund. In November 2017, Gordon

14

Peterson designated Ruth Peterson and Plaintiff as "co-equal advisors" of the Fund, and Plaintiff became the Fund's sole advisor when Ruth Peterson passed away.

65.    As Gordon Peterson's successor-in-interest with respect to the Fund, Plaintiff retains the same rights and privileges that Gordon Peterson exercised while he was the Fund's donor/advisor and is a party to the contract governing the Fund.

66.    Upon information and belief, the contract between the parties consists of a series of agreements, including the initial Fund agreement, the 2017 amendment, the agreements to fund the Fund, the policies and procedures of Waterstone, and the representations that Waterstone made to Gordon Peterson and Plaintiff.

67.    Plaintiff had advisory privileges with respect to distribution and investment of the amounts in the Fund pursuant to the parties' agreements and 26 U.S.C. § 4966(d)(2)(A).

68.    To properly exercise these privileges, Plaintiff required reliable communication with WaterStone; access to Fund information; periodic accurate and timely accountings of the Fund's assets; knowledge of all fees and other deductions from the Fund; and information related to WaterStone's investment of the Fund's assets.

69.    Accordingly, the terms of the parties' contract include, but are not limited to: that Plaintiff is the sole advisor to the Fund; as the advisor to the Fund,

15

Plaintiff is entitled to make grant recommendations, participate in communications about the Fund, and access Fund account information; Waterstone must consider Plaintiff's grant recommendations in good faith and either approve them or, if they deny them, provide a complete explanation for the denial; and Waterstone must abide by its own policies, including regarding Fund transfer.

70.     For over six years, from late 2017 through 2023, WaterStone treated Plaintiff as the advisor to the Fund and recognized his associated statutory rights.

71.     Waterstone's course of conduct reflected its recognition of Plaintiff as the Fund's advisor.

72.     Plaintiff has performed or stood ready, willing, and able to perform all obligations required of him as the Fund's advisor.

73.     WaterStone breached the contract by, among other things: withdrawing its recognition of Plaintiff as the advisor to the Fund; refusing to communicate with Plaintiff; failing to timely consider eligible grant recommendations; failing to explain its refusal to approve eligible granting recommendations; imposing unauthorized restrictions; failing to provide accurate and timely accountings; assessing unauthorized or undisclosed fees; deviating from investment guidelines or prudent management; and failing to maintain adequate controls and communications with Plaintiff.

74.     WaterStone has refused to respond to Plaintiff's repeated requests to be provided with a copy of any agreement or agreements governing the Fund.

16

75.     Waterstone's breaches have caused Plaintiff harm. He has lost the ability to recommend grants, participate in the grant-making process, interact with grantees, communicate with Waterstone, obtain the benefit of being associated with the Fund, and exercise his statutory oversight responsibilities.

76.     Plaintiff cannot be adequately compensated by an award of monetary damages. As of the last accounting that Plaintiff is aware of, in December 2023, the Fund held more than $21 million in charitable assets contributed over nearly two decades to advance a specific evangelical mission reflecting the deeply personal philanthropic intentions of Gordon Peterson. The Fund's charitable purpose, supporting Christian ministries, humanitarian efforts, and evangelism worldwide, is unique and cannot be replicated or replaced by a monetary award. No amount of money damages can restore the lost charitable opportunities, Gordon Peterson's legacy, or the humanitarian and evangelical impact that the Fund was specifically established to achieve.

77.     WaterStone's continued refusal to honor or consider grant recommendations, to communication with Plaintiff, and to facilitate the transfer of the Fund to a sponsoring organization willing to carry out its charitable mission frustrates the Fund's recognized purpose and causes ongoing, irreparable harm to Plaintiff, to the Fund, and to the charities the Fund was established to benefit. The financial harm cannot be precisely calculated at this time, continues to accrue with

17

each day that distributions are withheld, and cannot be adequately remedied by a damages award after the fact.

78.    Plaintiff is therefore entitled to a declaratory judgment, declaring his rights as advisor to the Fund; a decree of specific performance, requiring WaterStone to comply with the terms of the contract; and injunctive relief, enjoining WaterStone from continued bad faith conduct.

79.    WaterStone's breach also means that Plaintiff does not know the total sum of the Fund's assets. Without access to Fund information or an accounting, Plaintiff is unsure of whether any assets have been withdrawn from the account, and he has no way of determining the current amount in the Fund he is supposed to be advising. No legal remedy can identify the transactions that have occurred in the Fund over the last two years. Therefore, Plaintiff is entitled to an accounting of the Fund's assets from January 1, 2024, through the present and continuing.

80.    Finally, Plaintiff and the Fund have sustained damages in an amount to be proven at trial, including compensatory damages, expectancy damages, consequential damages, and/or nominal damages. They are entitled to equitable relief including specific performance and injunctive relief requiring WaterStone's compliance with its obligations.

18

## SECOND CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

81.    Plaintiff incorporates herein the allegations set forth above.

82.    The contract under which WaterStone created the Fund includes an implied covenant of good faith and fair dealing requiring that neither party do anything to defeat or impair the other's right to receive the benefits of the agreement.

83.    Under the contract, WaterStone agreed to establish a donor-advised fund for the purpose of encouraging and promoting the spread of Evangelical Christianity worldwide.

84.    WaterStone breached its implied covenant by its acts and omissions described above, including unreasonably and arbitrarily withholding or delaying approval of eligible grant recommendations; failing to provide accurate and timely statements and disclosures; refusing to apprise Plaintiff of withdrawals from the Fund or investment strategies of its assets; imposing conditions not contemplated by its agreement with the Fund's donor; and refusing even to communicate with Plaintiff as the Fund's advisor, much less consider his recommendations for donations from the Fund.

85.    Through these discretionary actions, WaterStone has thwarted the Fund's purpose and frustrated the reasonable expectations of Plaintiff.

86.    Waterstone's breach has caused Plaintiff harm. He has lost the ability to recommend grants, participate in the grant-making process, interact with

19

grantees, communicate with Waterstone, obtain the benefit of being associated with the Fund, and exercise his statutory oversight responsibilities.

87.    Plaintiff cannot be adequately compensated by an award of monetary damages. As of the last accounting that Plaintiff is aware of, in December 2023, the Fund held more than $21 million in charitable assets contributed over nearly two decades to advance a specific evangelical mission reflecting the deeply personal philanthropic intentions of Gordon Peterson and his family. The Fund's charitable purpose, supporting Christian ministries and evangelism worldwide, is unique and cannot be replicated or replaced by a monetary award. No amount of money damages can restore the lost charitable opportunities, Gordon Peterson's legacy, or the evangelical impact that the Fund was specifically established to achieve.

88.    WaterStone's continued refusal to honor or consider grant recommendations, to communication with Plaintiff, and to facilitate the transfer of the Fund to a sponsoring organization willing to carry out its charitable mission thwarts the Fund's recognized purpose and causes ongoing, irreparable harm to Plaintiff, to the Fund, and to the charities the Fund was established to benefit. The financial harm cannot be precisely calculated, continues to accrue with each day that distributions are withheld, and will not be remedied by a damages award after the fact.

89.    Plaintiff is therefore entitled to a declaratory judgment, declaring his rights as advisor to the Fund; a decree of specific performance, requiring

WaterStone to comply with the terms of the contract; and injunctive relief, enjoining WaterStone from continued bad faith conduct.

90.    WaterStone's breach also means that Plaintiff does not know the total sum of the Fund's assets. Without access to Fund information or an accounting, Plaintiff is unsure of whether any assets have been withdrawn from the account, and he has no way of determining the current amount in the Fund he is supposed to be advising. No legal remedy can identify the transactions that have occurred in the Fund over the last two years. Therefore, Plaintiff is entitled to an accounting of the Fund's assets from January 1, 2024, through the present and continuing.

91.    Finally, Plaintiff and the Fund have sustained damages in an amount to be proven at trial, including compensatory damages, expectancy damages, consequential damages, and/or nominal damages. They are entitled to equitable relief including specific performance and injunctive relief requiring WaterStone's compliance with its obligations.

**THIRD CLAIM FOR RELIEF**
**(Negligent Misrepresentation)**

92.    Plaintiff incorporates herein the allegations set forth above.

93.    In connection with its solicitation of donors and administration of donor-advised funds, WaterStone made material representations of fact to donors, prospective donors, and fund advisors, including Plaintiff and his father, Gordon Peterson. These representations include, but are not limited to:

21

A. That Plaintiff would become the advisor to the Fund and that Waterstone would recognize Plaintiff as the Advisor to the Fund;

B. That Plaintiff would have the right to make grant recommendations and that Waterstone would give them due and good faith consideration;

C. That Plaintiff would be included in discussions about grant-making, investment strategy, and Fund administration;

D. That Waterstone would timely communicate with Plaintiff;

E. That Plaintiff would have access to all Fund information, including account information, grant-making history, and Fund documents; and

F. that Plaintiff could move the fund to a different organization sponsoring donor-advised funds.

94.    These representations were false or misleading. Beginning in 2024, WaterStone refused to recognize Plaintiff as an advisor to the Fund, consider his recommendations in good faith, communicate with Plaintiff, or provide Plaintiff with Fund information.

95.    WaterStone, as a professional sponsor and administrator of donor-advised funds holding itself out as providing specialized charitable giving services, owed a duty to exercise reasonable care in making representations to donors and fund advisors regarding the nature and quality of its services.

22

96.     WaterStone breached this duty by making representations it knew or should have known were false or misleading, or by failing to exercise reasonable care in ascertaining the truth of its representations.

97.     Plaintiff justifiably relied on WaterStone's representations in agreeing to serve as advisor to the Fund, in submitting grant recommendations to WaterStone, and in refraining from seeking to transfer the Fund to another sponsor.

98.     As a direct and proximate result of WaterStone's negligent misrepresentations and Plaintiff's justifiable reliance thereon, Plaintiff and the Fund have suffered damages, including but not limited to: the failure to distribute approximately $1 million to Operation Mobilization as recommended; the complete failure to make any charitable distributions in 2024; lost investment returns on uninvested Fund assets; the frustration of the Fund's charitable purposes; and costs incurred to investigate and remedy WaterStone's misconduct.

### FOURTH CLAIM FOR RELIEF
**(Violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101, et seq.)**

99.     Plaintiff incorporates herein the allegations set forth above.

100.    The Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-101, et seq., prohibits deceptive trade practices in connection with the sale or advertisement of goods or services to consumers.

101.    WaterStone is engaged in the business of providing donor-advised fund sponsorship and charitable giving administration services to donors and fund advisors in Colorado and throughout the United States.

102.    Plaintiff, as the designated advisor to the Fund, and Gordon Peterson, as the donor who established the Fund, are or were actual consumers of WaterStone's charitable giving services.

103.    WaterStone made representations to Plaintiff that he would, among other things, be able to continue directing grants from the Fund and the other representations alleged herein.

104.    Plaintiff specifically relied on WaterStone's representations to make management decisions regarding the Fund—including the decision to keep the Fund at WaterStone instead of transferring it to another sponsoring organization.

105.    WaterStone's representations to Plaintiff were false and misleading, as evidenced by WaterStone's sudden revocation of Plaintiff's access to the Fund, its termination of communications with Plaintiff, and its refusal to recognize Plaintiff's statutory rights as advisor to the Fund.

106.    These false and misleading statements constitute a deceptive trade practice.

107.    In the course of its business, WaterStone knowingly engages in deceptive trade practices by making similar false and misleading representations to donors and fund advisors.

24

108.    WaterStone's deceptive trade practices described herein significantly impact the public as actual and potential consumers of WaterStone's donor-advised fund services. WaterStone solicits and administers donor-advised funds from numerous donors throughout Colorado and the United States premised on its claim of being donors' "charitable bank account." Based on WaterStone's statements to Plaintiff and its similar statements to donors and potential donors throughout the State and beyond, Waterstone has elicited over $3.2 billion in contributions—much of it in the form of contributions to donor-advised funds.

109.    WaterStone's false and misleading representations regarding the nature and quality of its services are directed to the public at large and have the capacity to mislead current and prospective donors and fund advisors who rely on such representations in deciding whether to establish or maintain donor-advised funds with WaterStone.

110.    In fact, the broader public has already been impacted by WaterStone's misrepresentations to Plaintiff, as evidenced by the significant media attention this case has garnered in both the local and national news.[1]

---

[1] One local Colorado Springs newspaper, the Gazette, has published at least one article related to this lawsuit, *see* https://gazette.com/2026/01/28/lawsuit-filed-against-christian-focused-charitable-fund-in-colorado-springs-with-tebow-connection/. However, this matter has also reached beyond the local news to the national news media including Philanthropy Roundtable, *see* https://www.philanthropyroundtable.org/donor-intent-watch-a-discussion-on-the-ownership-of-dafs/, and CNBC, *see* https://www.cnbc.com/2026/02/26/lawsuit-donor-advised-fund-risks.html.

111.    Further, legal and financial professionals on social media have broadcast the significance of WaterStone's conduct to other users. As one user noted, "the entire point of a donor-advised fund is the practical promise: you can recommend grants over time, to causes you choose, with an expectation those recommendations will be followed absent something extreme or generally not allowed … If a court blesses sponsors ignoring appointed advisors, it doesn't just impact one family's fund. It could send a real chill through a $325B+ DAF ecosystem that already struggles with trust and transparency." *See* **Exhibit 3**.

112.    Given the media attention, it is evident that other charitable donors and fund advisors have been or may be harmed by WaterStone's deceptive practices, including WaterStone's pattern of treating larger funds with less deference than smaller funds, contrary to its representations of personalized service.

113.    Given WaterStone's insistence that advisors retain no rights, consumers of WaterStone's charitable giving services lack bargaining power in their dealings with WaterStone.

114.    Gordon Peterson justifiably relied on WaterStone's representations in establishing the Fund with WaterStone and contributing over $21 million in charitable assets to the Fund. Plaintiff justifiably relied on WaterStone's representations to decide to maintain the Fund with WaterStone rather than seeking to transfer it to another sponsor.

115.    As a direct and proximate result of WaterStone's deceptive trade practices, Plaintiff and the Fund have suffered actual damages and losses, including those described herein and the costs and attorneys' fees incurred in bringing this action.

116.    Pursuant to C.R.S. § 6-1-113, Plaintiff is entitled to recover actual damages sustained as a result of WaterStone's deceptive trade practices, together with costs and reasonable attorneys' fees.

117.    WaterStone's deceptive trade practices were willful and knowing, entitling Plaintiff to an award of treble damages pursuant to C.R.S. § 6-1-113(2)(a).

**FIFTH CLAIM FOR RELIEF**
**(Declaratory Judgment (28 U.S.C. § 2201))**

118.    Plaintiff incorporates herein the allegations set forth above.

119.    An actual, justiciable controversy exists between the parties regarding their respective rights, duties, and obligations under the agreement governing the Fund and applicable law, including but not limited to:

A.  whether Plaintiff, as the duly designated contractual advisor of the Fund, retains the authority to recommend grants from the Fund and whether WaterStone must give due and good-faith consideration to such recommendations;

B.  whether WaterStone has a duty to communicate with Plaintiff and respond to his grant recommendations in a timely manner;

C. whether WaterStone may refuse to consider grant recommendations based on personal animosity toward the Fund's advisor rather than on the merits of the recommendations or the eligibility of proposed grantees;

D. whether the Operation Mobilization grant recommendation submitted by Plaintiff was consistent with the Fund's Purpose Statement and charitable objectives and should have been honored;

E. whether WaterStone has a duty to provide Plaintiff with regular, accurate, and complete accountings of the Fund's assets, transactions, fees, and investment performance;

F. whether WaterStone may unilaterally deny Plaintiff access to the Fund's account information and online portal;

G. whether WaterStone's conduct in refusing to distribute any funds from the Fund during 2024 and its refusal to communicate with Plaintiff violates its obligations as sponsor and administrator of the Fund;

H.  whether WaterStone can limit grant amounts and specify a narrow time period when grant recommendations can be submitted;

I. whether Plaintiff is entitled to access all Fund documents, including the agreement or agreements creating the Fund in 2005; and

J. whether the Fund is a donor-advised fund if there is no advisor to the Fund as required by 26 U.S.C. § 4966(d)(2)(A)(iii).

28

120.    A declaration of the parties' rights and obligations is necessary and appropriate to resolve this actual controversy and to provide guidance for the ongoing administration of the Fund. Without such a declaration, uncertainty will continue regarding Plaintiff's rights as advisor, WaterStone's corresponding duties, and the proper administration of the Fund in furtherance of its charitable purposes.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant, and award the following relief:

**A.** A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that:

i. Plaintiff is the duly authorized sole advisor of the Peterson Family Stewardship Fund with full authority to recommend grants consistent with the Fund's Purpose Statement;

ii. WaterStone has a duty to give due and timely consideration to eligible grant recommendations submitted by Plaintiff as the Fund's advisor;

iii. WaterStone may not refuse to consider or process grant recommendations based on personal animosity toward the Fund's advisor;

iv. WaterStone has a duty to communicate with Plaintiff regarding the Fund's administration and to respond to his inquiries and grant recommendations;

29

v. WaterStone has a duty to provide Plaintiff with regular, accurate, and complete accountings of the Fund's assets, transactions, fees, expenses, investment decisions, and performance;

vi. WaterStone may not unilaterally deny Plaintiff access to the Fund's account information and online portal;

vii. The Operation Mobilization grant recommendation submitted by Plaintiff was consistent with the Fund's charitable purposes and giving history, and should have been processed and honored;

viii. WaterStone's conduct as alleged herein constitutes a breach of its contractual obligations and its implied covenant of good faith and fair dealing; and

ix. Waterstone must transfer the Fund in kind to a different sponsoring organization of Plaintiff's choice at Plaintiff's discretion;

**B.** Preliminary and permanent injunctive relief:

i. Ordering WaterStone to immediately restore Plaintiff's access to the Fund's account information and online portal;

ii. Requiring WaterStone to communicate with Plaintiff regarding the administration of the Fund and to timely respond to his inquiries;

iii. Requiring WaterStone to promptly consider, process, and honor eligible grant recommendations submitted by Plaintiff in accordance with WaterStone's course of conduct from 2017 through 2023;

iv. Requiring WaterStone to provide Plaintiff with complete, timely, and accurate quarterly (or more frequent) statements and accountings of the Fund's assets, transactions, fees, and investment performance;

v. Enjoining WaterStone from charging unauthorized or undisclosed fees on Fund assets;

vi. Requiring WaterStone to administer the Fund in good faith and in a manner consistent with the Fund's Purpose Statement and the donor's charitable intent; and

viii. Requiring WaterStone to permit transfer of the Fund in kind to a different sponsoring organization of Plaintiff's choice.

**C.** A full and complete accounting of the Fund's assets, transactions, allocations, fees, expenses, investment decisions, and performance for the period from January 1, 2024, to the present, and continuing;

**D.** Compensatory damages in an amount to be proven at trial;

**E.** Treble damages as allowed by law;

**E.** Pre- and post-judgment interest as allowed by law;

**F.** Costs of suit, including reasonable attorneys' fees; and

**G.** Such other and further relief as the Court deems just and proper.

DATED this 7th day of April, 2026.

31

*/s/ Andrew Nussbaum*
Andrew Nussbaum
Edward A. Gleason
Robert J. Bucknam
First & Fourteenth PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
Phone: (719) 428-3093
Email: andrew@first-fourteenth.com
        ed@first-fourteenth.com
        rob@first-fourteenth.com
*Attorneys for Plaintiff Philip Peterson*