IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 26-cv-00179-GPG-MDB

PHILIP G. PETERSON, in his capacity as Successor Advisor to the Peterson Family Stewardship Fund,

Plaintiff,

v.

CHRISTIAN COMMUNITY FOUNDATION, INC. d/b/a WaterStone, a Colorado nonprofit corporation,

Defendant.

---

**ORDER**

---

Before the Court is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (D. 34). The Court GRANTS IN PART the motion for the following reasons.

This is an unusual case. In 2017, Plaintiff Philip G. Peterson was designated Successor Advisor to the Peterson Family Stewardship Fund (Fund), a donor advised fund.[1] The Fund was established in 2005 by Plaintiff's father, Gordon Peterson, now deceased. The Fund is administered by Defendant Christian Community Foundation, Inc. d/b/a WaterStone (WaterStone). The Fund contains more than $21 million and is intended to make donations to "encourage and promote the spread of Evangelical Christianity" (D. 33-2 at 3).

Plaintiff does not allege any issues related to the administration of the Fund before March 2024. At that time, a dispute arose between Plaintiff and WaterStone. The nature of the dispute

[1] The Court draws the facts from the First Amended Complaint and Jury Demand (Complaint).

is not alleged but certain consequences are. Related to the dispute, "WaterStone abruptly removed Plaintiff's access to the Fund's account information and online portal in an effort to deny Plaintiff his advisory role" (D. 32 at 9). The fund made no charitable donations in 2024. "In 2025, WaterStone officials stated that, because of their unfounded negative feelings toward Plaintiff, WaterStone would not accept Plaintiff's recommendations for grants, and refused to have any further communication with him" (*id*. at 10).

The operative First Amended Complaint and Jury Demand (Complaint) contains as an exhibit an "APPLICATION" signed by Plaintiff's father (Application), which contains a short paragraph captioned "Agreement" (Agreement) stating:

> By completing and signing this application, we certify that we understand the nature of Donor Advised Funds and will conduct our activities in compliance with the regulations of the Internal Revenue Code. We will abide by the policies and conditions set forth by the Christian Community Foundation, which in some instances, exceed government requirements. We acknowledge receipt of a current fee schedule and understand that fees will apply[] when the account is funded. We understand that in order for our contributions to qualify as an Income tax deduction, our gift is irrevocable, and the ownership and custody of our donated funds and property will be fully relinquished to the Christian Community Foundation. Further, we understand that our communication regarding the fund is advisory only and that ultimate decisions and control relative to each of these issues are the responsibility of Christian Community Foundation.

(D. 33-2) (emphasis omitted).

Plaintiff alleges that there may be other agreements beyond the Application and that he "has repeatedly requested a copy of the Fund agreement or agreements, but Waterstone has refused to provide a copy of them" (D. 32 at 6). "Waterstone has never indicated that the Application is also the Fund agreement or agreements" (*id*. at 7). "Further, Waterstone has refused to provide a

copy of its policies and procedures to Plaintiff" (*id.*). Instead, "WaterStone's CEO told Mr. Peterson never to contact WaterStone again" (*id.* at 2). "WaterStone's stated position is that it owes *no* duties to its fund advisors and may disregard them entirely" (*id.*).

Plaintiff filed suit. He brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and breach of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 et seq. (CCPA).

Waterstone's briefing parallels the position it allegedly took with Plaintiff. WaterStone argues that Plaintiff has no rights under the agreement and that nothing it told him (or his father) can represent an actionable misrepresentation because Plaintiff has no rights even to communicate with it (D. 34 at 6–7). WaterStone further argues that the negligent misrepresentation claim is barred by the economic loss rule and that the CCPA claim is not viable because this is a purely "private dispute" (*id.* at 7).

WaterStone's arguments generally fail to engage in good faith with the contents of the Complaint and are essentially a waste of the Court's time. Its *lead argument* is that "Plaintiff cannot state a claim for breach of contract because he is not a party to the Sponsorship Agreement" (D. 34 at 9).

Problematically, "Sponsorship Agreement" is not a term that appears in the Complaint and is not defined by WaterStone. Although it is not at all clear, the Reply suggests that WaterStone's position is that the Agreement section within the Application is the entire relevant contractual agreement (*see* D. 42 at 5) ("Plaintiff first attempts to avoid dismissal by recharacterizing the Agreement [] as an 'application'"). WaterStone, therefore, appears to use "Sponsorship Agreement" to refer to the Agreement section only. This position is contrary to the Complaint,

which suggests the existence of more detailed agreement terms with well-pleaded factual allegations, and inconsistent with the Application itself.[2]

With this understanding, we return to WaterStone's lead argument that Plaintiff cannot enforce the Agreement because he is not a signatory.[3] The Application is a single unified document that explicitly contemplates "SUCCESSOR ADVISEMENT" by designated individuals "with the same advisory rights" as the original funder (D. 33-2). Could such people be designated third-party beneficiaries entitled to enforce a contract? Of course. Does WaterStone address this? No. Further, Plaintiff is the son of the deceased signatory to the contract who is designated by that signatory to enjoy those rights. Could Plaintiff have rights as a successor in interest through inheritance? WaterStone also does not address this issue either, merely noting that Plaintiff's name does not appear on the original document. This argument is not persuasive.

WaterStone's subsequent arguments are similarly premised on its unsupported, narrow understanding of the contractual relationship and its duties. It argues variously that it has no duties to Plaintiff. WaterStone is undoubtedly right in many respects, the Application is clear that "ownership and custody" of donated funds were "fully relinquished to" WaterStone and that, consistent with related tax provisions, Plaintiff has no right to *require* that specific donations be made. *See Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1053 (9th Cir. 2022) (explaining legal basis and nature of donor advised funds).

---

[2] Even if it were not contrary to the well-pleaded factual allegations in the Complaint, it would still be obviously wrong. The Application in the record appears incomplete. The last included page indicates it is "Page 2 of 4" (D. 33-2 at 2). The Agreement also refers to other documents as governing WaterStone's duties, namely WaterStone's own "policies and conditions" and "fee schedule" that are not in the record (*id.*). *See Pinkert*, 48 F.4th at 1055 (finding program policies dispositive of donor rights).

[3] The Application is also not signed by WaterStone.

But WaterStone takes its position too far in asserting that the "Sponsorship Agreement does not call for WaterStone to . . . engage in particular communications" (D. 34 at 9). Even the Agreement portion of the Application specifically references advisors "communication regarding the fund," while noting that such communications are "advisory only and that ultimate decisions" rest with WaterStone. As noted above, the Application also references the "advisory rights" of successor advisors, such as Plaintiff.

The Application is for a donor *advised* fund. The clear implication of the agreement is that WaterStone will receive *advice* from the donor or his designee, such as Plaintiff. Yet Plaintiff has alleged that the CEO of WaterStone told Plaintiff to never contact WaterStone again. It is unclear how this can be consistent with WaterStone's contractual duties and the related representations it made.[4] WaterStone has also denied Plaintiff access to information that would be practically necessary to furnish advice, such as the contents of the Fund and the Fund's terms. WaterStone does not explain how Plaintiff is to exercise his "advisory rights" if WaterStone refuses to communicate with him. Nor does WaterStone cite any authority suggesting that it can unilaterally decide that a donor advised fund should not be donor advised or that doing so would not constitute injury to the advisor and breach of the Fund's terms. *See Pinkert*, 48 F.4th at 1055 (suggesting deprivation of advisory rights would be sufficient to constitute injury). Accordingly, the Court will deny the Motion with respect to Plaintiff's contract and misrepresentation claims.

---

[4] WaterStone's other arguments regarding the misrepresentation claim must be rejected at this point. Representations to Plaintiff (and his father) that he was the Fund advisor were plainly false when made if WaterStone believed, as it appears to, that Plaintiff (and his father) had no "advisory rights" as referenced in the Application. Whether the economic loss rule applies to the misrepresentation claim cannot be decided at this point because the scope of the agreement is unclear, partly due, for example, to WaterStone's refusal to provide its policies and conditions referenced in the Agreement. *See Pinkert*, 48 F.4th at 1055. Additionally, the Court declines to address whether Plaintiff has any specific rights or remedies beyond the right to advise at this point because the full terms of the agreement are unclear and the parties have not specifically addressed these issues.

WaterStone's argument that the public impact element of the CCPA claim is not satisfied warrants brief additional discussion. In order to determine whether a "challenged practice significantly impacts the public within the context of a CCPA claim" as required, courts consider "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo. 2003). Plaintiff points to its allegations showing public interest in the issues raised by his case as well as WaterStone's size and argues that WaterStone's position has the "'capacity' to affect the public at large" (D. 38 at 18) (quoting *Rhino Linings*, 62 P.3d at 149). But "capacity" is only an issue under the CCPA with respect to whether a "false representation had the capacity or tendency to deceive, even if it did not." *Rhino Linings*, 62 P.3d at 148. Significant public impact is a separate, required showing. *Id*. at 150. The Complaint does not allege other instances where WaterStone's similar actions have impacted others or is likely to do so in the future. Instead, the Complaint suggests an isolated personal dispute between Plaintiff and WaterStone that will not support a CCPA claim. Accordingly, the Court grants the motion only insofar as the CCPA claim is dismissed.

Accordingly, Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (D. 34) is GRANTED IN PART and DENIED IN PART. It is FURTHER ORDERED that Plaintiff's Fourth Claim for Relief under the CCPA is DISMISSED.

DATED November 19, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge